IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sheila Whetsel,                          :

      Plaintiff,                     :

   v.                                     :          Case No.  2:15-cv-3015

                                   :          JUDGE MICHAEL H. WATSON
Commissioner of Social Security,          Magistrate Judge Kemp

      Defendant.                     :

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, Sheila Whetsel, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on March 1, 2012, and alleged that Plaintiff became disabled on August 19, 2011.  That date was later amended to April 1, 2012.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on March 26, 2014.  In a decision dated June 20, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on October 29, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on January 25, 2016.  Plaintiff filed a statement of specific errors on March 17, 2016, to which the Commissioner responded on June 28, 2016.  Plaintiff filed a reply brief on July 18, 2016, and the case is now ready to decide.

### II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 48 years old as of the date of the hearing and who has a high school education, testified as follows.  Her testimony appears at pages 50-64 of the administrative record.

Plaintiff said that she had once worked as an engine bearings inspector, a job which required lifting 25 to 30 pounds. She alternated between sitting and standing on that job, and missed work due to back pain. She had been treated with hot packs, traction, and physical therapy, but nothing had helped. Medications did not help either. She was also on medication for hallucinations. Plaintiff testified to a shoulder problem as well.

When asked about her physical capabilities, Plaintiff said that she could stand for five to ten minutes and lift five to eight pounds. She had difficulty holding on to objects with her left hand.

On a typical day, Plaintiff said that "we stay in bed, all of us we stay in bed because we don't like, we got to change scenery when people ... are around." (Tr. 59). She explained that Linda and Sherry came to see her and talk to her but that her husband could not see them. Linda and Sherry had been "with her" since she was raped when she was younger. She called the crisis line often during the day. She had not driven in months but did go to church with her husband. She also had daily crying spells.

III. <u>The Medical Records</u>

The pertinent medical records are found beginning at page 425 of the record and can be summarized as follows. Since the statement of errors focuses on Plaintiff's psychological impairments, the Court's summary of the records will be limited to those which are relevant to the issues Plaintiff has raised.

There are a number of records about mental health treatment which predate Plaintiff's alleged onset date. She was seen at Consolidated Care for substance abuse addiction beginning on October 10, 2010. She was treated through group therapy and mental health counseling, during which she was described as, at

times, hopeful and participating well in her treatment plan, and, at other times, crying, in pain, and sad and distressed. She was also diagnosed with PTSD during that time. (Tr. 540-83, 598). A mental status evaluation done on November 1, 2010, indicated no delusions or hallucinations and logical thought processes. (Tr. 611). She continued with her substance abuse counseling through June 15, 2011.

On September 21, 2011, Dr. Schulz, a psychologist, performed a consultative psychological evaluation. Plaintiff said the basis of her disability application was low back pain and rheumatoid arthritis. She was taking no medication at that time. She said that the substance abuse program had helped to maintain sobriety. Plaintiff said that learning job duties had always been hard for her but she had never taken time off work due to mental difficulties and always got along well with others in the work setting. She had driven herself to the appointment, a distance of forty miles. Plaintiff reported that watching television and reading the Bible were her primary daily activities and that she could wash dishes, clean, cook, and go shopping. Her affect and mood were congruent, but she reported feeling sad most days. Dr. Schulz diagnosed depressive and anxiety disorders as well as a substance-related disorder and rated her GAF at 60. He thought that she could deal with job instructions consistent with her borderline intelligence, could do routine and repetitive tasks, could get along well with others, and would likely have some difficulty responding to work pressure. (Tr. 673-82).

In contrast to that assessment, Plaintiff's counselor at Consolidated Care, Debbie Brownlee, filled out a form on April 17, 2012, indicating that Plaintiff said she could not work due to depression and stress and that she felt threatened by supervisors and coworkers. She also reported being angry when

-3-

she did work and feeling overwhelmed by chaos in the workplace, and said she had been accused of creating a hostile work environment for others and disciplined for not showing up for work.  She also demonstrated unreliability in keeping her counseling appointments.  (Tr. 684-85).  The accompanying treatment notes indicated that Plaintiff was making some (and often good) progress and that she was usually pleasant and cooperative.  Her mood was frequently described as depressed but hopeful, and her diagnoses included major depressive disorder. Plaintiff ended treatment at Consolidated Care on September 4, 2012, having last been seen there on July 28, 2012.  Ms. Brownlee then wrote a letter dated March 25, 2014, in which she again recapped her treatment of Plaintiff, indicating that Plaintiff had a GAF of 43, that her depression worsened during the treatment period, and that she was having increased identity disturbances and psychotic episodes.  Ms. Brownlee said that when Plaintiff lost her job in October, 2011, Plaintiff retreated to her bedroom and suffered a decrease in normal functioning. Plaintiff moved to Dayton in 2012 but still called Ms. Brownlee occasionally, sounding "distressed, fearful, anxious, and removed from reality."  Ms. Brownlee concluded that Plaintiff could not tolerate work pressure or meet quality standards required by employers.  (Tr. 955-56).

Dr. LaTurner completed a mental functional capacity assessment report indicating that he had seen Plaintiff on May 22, 2012.  It is not clear when he completed the form.  On it, he indicated that Plaintiff was not employable, and he described her as markedly or extremely limited in almost every area of functioning.  The only exception to that assessment was a moderate limitation in the area of being able to ask simple questions or request assistance.  (Tr. 952-53).  The form he completed refers to a report which does not appear in the record.

-4-

After Plaintiff moved to Dayton, she received treatment from Day-Mont Behavioral Healthcare.  Progress notes from that organization reflect treatment from November 19, 2013 through April 3, 2014.  Those notes (Tr. 967-1041) show generally that Plaintiff was depressed but cooperative, that she reported being pressured by everyday life, and that she heard voices, suffered from racing thoughts, and had nightmares.  She was also constantly afraid, and her symptoms had worsened in the past two years.  The diagnoses included a psychotic disorder.  Both auditory and visual hallucinations were noted and her perception was also described at times as paranoid and psychotic.  Treatment notes after that date show some improvement in her symptoms with medication.  (Tr. 1055-1108).

Plaintiff's more recent treating psychiatrist, Dr. Tasnin, completed an evaluation form on April 9, 2014, indicating that Plaintiff had been seen monthly since January 9, 2014, that she suffered from schizophrenia, a mood disorder, and PTSD, that her current GAF was 45, that she had a host of psychological symptoms including delusions or hallucinations and oddities of thought, perception, speech, and behavior, that her attention and concentration were poor, that her memory was impaired, that her response to treatment had been poor, that she would be absent from work more than three times per month, and that she had extreme restrictions in every area of functioning.  (Tr. 1042-45).

Finally, some of the records were reviewed by state agency psychologists.  First, Dr. Dietz concluded, on September 29, 2011, that Plaintiff could work in an environment with flexible production standards and schedules and could perform 3-4 step tasks, even though she had some moderate psychological limitations.  (Tr. 82-84).  On May 5, 2012, Dr. Warren found

-5-

Plaintiff somewhat more limited, concluding that she could adapt
to a work setting where duties were routine and predictable and
that she was also limited to occasional interaction with others.
Dr. Warren also said that Plaintiff "could complete a workday
with an occasional extra break and can keep up a consistent, but
not rapid, pace." (Tr. 109-111). The reviewers did not have the
benefit of any of the treating source opinions or of any
treatment notes from Day-Mont.

IV. <u>The Vocational Testimony</u>

Teresa Trent was called to testify as a vocational expert at
the administrative hearing. Her testimony begins at page 65 of
the administrative record.

Ms. Trent first testified about Plaintiff's past relevant
work. She said that the inspector job which Plaintiff had done
was a light, semi-skilled job.

Next, Ms. Trent was asked some questions about someone with
Plaintiff's background and who could work at the light exertional
level and who could occasionally push or pull with the left upper
extremity, but was right-hand dominant. The person could not
climb ladders, ropes, or scaffolds, could stoop and crouch
frequently, could occasionally reach in all directions with the
left arm, and had to avoid all exposure to hazards including
moving machinery and unprotected heights. That person was also
limited to simple, routine, repetitive tasks, could tolerate only
occasional changes in the work setting, could not be subjected to
strict production rates or fast-paced work, and could interact
only occasionally with the public and coworkers. Ms. Trent said
that someone with those restrictions could not do Plaintiff's
past work, but that the person could perform 20,000 jobs in the
regional economy and one million jobs in the national economy, in
positions like hand bander, weigher, and silver wrapper. If the
person could not lift more than ten pounds, he or she could do

-6-

jobs like lens inserter, table worker, or sorter.  Being off task
for more than ten percent of the day in addition to regularly
scheduled breaks would preclude competitive employment, however.

V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 21-
38 of the administrative record.  The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
met the insured status requirements of the Social Security Act
through June 30, 2016.  Second, she found that Plaintiff had not
engaged in substantial gainful activity since her alleged onset
date.  Going to the next step of the sequential evaluation
process, the ALJ concluded that Plaintiff had severe impairments
including mild degenerative disc disease of the lumbar spine,
mild degenerative joint disease of the left hip, osteoarthritis
of the left shoulder with impingement, obesity, borderline
intellectual functioning, affective disorder, psychotic disorder,
anxiety disorder, personality disorder, and episodic cannabis
abuse.  The ALJ also found that these impairments did not, at any
time, meet or equal the requirements of any section of the
Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix
1).

Moving to the next step of the sequential evaluation
process, the ALJ found that Plaintiff had the residual functional
capacity to perform work at the light exertional level and,
although she could not climb ladders, ropes, or scaffolds, she
could stoop and crouch frequently and could occasionally reach,
reach overhead, push, and pull with her left upper extremity.
Also, she had to avoid all exposure to hazards including
operational control of moving machinery and work at unprotected
heights.  Plaintiff was also limited to simple, routine,
repetitive tasks involving no production rate or pace work and

-7-

could tolerate only occasional changes in the work setting and only occasional interaction with coworkers and the general public.

With these restrictions, the ALJ concluded that Plaintiff could not do her past relevant work, but she could perform the light jobs identified by the vocational expert, including hand bander, weigher, and silver wrapper. The ALJ further determined that these jobs existed in significant numbers in the regional and the national economy, and that Plaintiff could also perform a significant number of sedentary jobs. Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not give proper weight to the opinions of Plaintiff's treating doctors; and (2) the ALJ did not properly assess Plaintiff's credibility. These issues are evaluated under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into

-8-

account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. The Treating Source Opinions

As noted in the Court's summary of the medical records, two different treating sources - Dr. LaTurner and Dr. Tasnin - both concluded that Plaintiff had work-preclusive mental limitations. The ALJ did not accept their views, instead finding that her limitations were essentially those expressed by a non-examining psychologist, Dr. Warren. The first question presented is whether the ALJ's decision on this issue is supported by substantial evidence, a question requiring an analysis both of the basis of her decision and the appropriate legal framework. The Court begins with the administrative decision.

The ALJ started this portion of the decision by recounting Plaintiff's history of treatment prior to her onset date. She noted that during Plaintiff's time in substance abuse treatment, her GAF was recorded as between 51 and 56, and pointed out that Plaintiff successfully completed the program in June, 2011. Next, she reviewed Dr. Schulz's evaluation report, which indicated that Plaintiff's functioning was adequate. That report was, as described above, prepared in 2011, and had been requested as part of a prior application for benefits.

The ALJ did acknowledge that Plaintiff's mental condition worsened in late 2011 when she lost her job and her home and her sister died. Although her GAF was rated at 43, the ALJ viewed this rating as inconsistent with the counselor's report about

-9-

Plaintiff's activities of daily living, and also observed that
Plaintiff progressed with treatment and missed a number of
appointments, something which "suggest[ed] tolerable
symptomatology." (Tr. 32).

Next, the ALJ considered Dr. LaTurner's report. She said
that this report did not include, nor was it accompanied by, a
written narrative of any examination, and there were "no progress
notes or any other indication of a treating relationship." Id.
As a result, she gave it no weight, finding it inconsistent with
the objective evidence in the treatment notes which predated it.

After noting that Plaintiff transferred her treatment to
Consolidated Care, the ALJ discussed Ms. Brownlee's letter. She
first gave significance to the fact that Plaintiff had not
pursued treatment for mental health issues between July, 2012,
and November, 2013. After summarizing Ms. Brownlee's
conclusions, which also supported disability, the ALJ gave this
opinion no weight as well, reasoning that it was inconsistent
with Ms. Brownlee's treatment notes and relied too heavily on
Plaintiff's self-report of symptoms, which the ALJ determined not
to be fully credible. (Tr. 33).

Lastly, the ALJ considered the course of Plaintiff's
treatment at Day-Mont. The ALJ seemed to associate Plaintiff's
self-referral to that facility with Plaintiff's receipt of a
reminder about her disability hearing. The initial intake
evaluation showed a GAF of 55 and described Plaintiff as having
average demeanor and eye contact, no abnormal activity, logical
thought processes, cooperative behavior, and a full affect with
depressed mood. At her initial meeting with Dr. Tasnin in
January of 2014, Plaintiff had a GAF of 50 and was prescribed
medications. The ALJ noted that Plaintiff had reported psychotic
symptoms at that time, and that she continued to report the
presence of "imaginary friends" or shadow people in follow-up
sessions. Turning to Dr. Tasnin's evaluation, the ALJ concluded

-10-

that it was done after only two treatment sessions, totaling one and one-half hours, and that the opinion "depart[ed] substantially from the rest of the evidence." (Tr. 34). According to the ALJ, the "totality of the medical evidence" (including notes from physicians who treated Plaintiff for physical ailments, and who did not mention any abnormal behavior) supported much less severe limitations. Given this inconsistency and the short duration of the treating relationship, the ALJ assigned little weight to Dr. Tasnin's evaluation as well. (Tr. 35).

In her statement of errors, Plaintiff focuses on the reports from Dr. LaTurner and Dr. Tasnin. As to the former, she disputes that Ms. Brownlee's notes, fairly read, are at all inconsistent with Dr. LaTurner's indication of marked or extreme limitations, noting that Ms. Brownlee reported that Plaintiff had been isolating herself, needed encouragement to maintain basic hygiene, and was in need of assistance with resources; the observation that she was also "pleasant and cooperative" was not, in Plaintiff's view, a reason to discount this other evidence of serious limitations. For much the same reasons, Plaintiff contends that the ALJ lacked a substantial basis for disregarding Dr. Tasnin's opinion. As part of her argument, she also notes that the opinions of the state agency psychologists, which the ALJ adopted, were based on a very limited review of the evidence - neither had seen any treatment notes beyond May 5, 2012, which is only a month after Plaintiff's alleged onset date - and were not subjected to the same level of scrutiny as were the opinions of the treating sources. She argues that these opinions do not provide substantial evidence in support of the ALJ's decision.

The Commissioner argues, in response, that Dr. LaTurner was not a treating source because the record shows that he examined Plaintiff only once, and there is no evidence that it was for the purposes of treatment. Additionally, Dr. Tasnin should not be

-11-

regarded as a treating source, either, because although she did treat Plaintiff, she had seen her only twice before expressing her opinion.  Finally, the Commissioner asserts that the ALJ correctly interpreted the various treatment notes as inconsistent with and not supportive of either doctor's opinion that Plaintiff had marked or extreme limitations in functioning.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The first issue is whether the ALJ was legally correct in failing to give the opinions of either Dr. LaTurner or Dr. Tasnin the deference due to treating sources.  As the Court of Appeals has said,

-12-

> A physician qualifies as a treating source if the
> claimant sees her "with a frequency consistent with
> accepted medical practice for the type of treatment
> and/or evaluation required for [the] medical
> condition." 20 C.F.R. § 404.1502. A physician seen
> infrequently can be a treating source "if the nature
> and frequency of the treatment or evaluation is typical
> for [the] condition." Id.

Smith v. Comm'r of Social Security, 482 F.3d 873, 876 (6th Cir.
2007). The courts review the classification of doctors as
treating sources on a *de novo* basis. Id. Any facts underlying
that determination which are supported by substantial evidence in
the record must be accepted by a reviewing court, however. Id.

The ALJ appears to be correct about the absence of any
evidence of a treatment relationship between Plaintiff and Dr.
LaTurner. There are no treatment or progress notes involving Dr.
LaTurner, and the form he completed shows that he is from Van
Wert, Ohio, which is not where Plaintiff was living or receiving
treatment. It is not clear which, if any, records he reviewed
before formulating his opinion. The ALJ's factual finding that
there was no treating relationship between Plaintiff and Dr.
LaTurner is therefore supported by substantial evidence, and
while that does not justify disregarding the opinion entirely, it
does relieve the ALJ of the duty to articulate the basis of her
decision in the way that 20 C.F.R. §404.1527(c) requires. Given
that, the ALJ's rationale, including the lack of a report and the
lack of support for the "check the box" form, is sufficient to
permit the Court to uphold her rejection of Dr. LaTurner's
opinions.

Dr. Tasnin, however, is clearly a treating source. It is
not unusual that in the first two months of a treating
relationship, a psychiatrist would see a patient who is also
undergoing counseling with others only twice. The ALJ did not
rely exclusively on the short duration of the treating

-13-

relationship, however, but also pointed out inconsistencies in the notes made by Dr. Tasnin and her report, some of which are valid bases for discounting it to some extent.  The Court cannot say, in the abstract, that the ALJ erred in giving somewhat less than controlling weight to Dr. Tasnin's conclusions, but it is problematic that the ALJ gave them only little weight, especially when one of the reasons for doing so - that Plaintiff did not exhibit unusual behavior when she went for physical examinations - is not particularly compelling.

This problem is compounded by the stale nature of the opinions which the ALJ did accept.  As noted, the consultative and state reviewer opinions are based only on examinations or treatment notes from 2010 to early 2012.  They did not factor in the views of Ms. Brownlee, who had a long-term counseling relationship with Plaintiff, or the notes from 2013 and 2014, many of which, as Plaintiff points out, demonstrate severe symptoms and serious issues of functioning.  Dr. Tasnin, although she had just begun to see Plaintiff in 2014, did have the benefit of both these records and of personally examining Plaintiff, and it is not clear why the outdated state agency reviews should have been given more weight than her opinion.  While the ALJ may have been on sound footing in determining that, as of 2012, Plaintiff had the functional capacity described by the ALJ, there is a substantial question about whether it had decreased over time.  Consequently, the Court believes that a remand is needed in order to address the significance of the post-2012 treatment, including a re-evaluation of Dr. Tasnin's opinions and, if appropriate, obtaining additional medical opinions about Plaintiff's functional capacity from 2013 forward.

B.  The Credibility Assessment

As noted, the ALJ also discounted Plaintiff's self-report of disabling psychological symptoms.  The ALJ concluded that Plaintiff had made inconsistent statements to treating sources,

-14-

including how long she had been sober, why she stopped working (she provided four different versions of that event), and whether she had actually been maintaining sobriety, and also found her first report of psychotic symptoms to have been timed to coincide with the disability hearing.  The ALJ also contrasted her statements with the absence of any evidence in the reports from medical doctors that she had psychological abnormalities.  Her statements were therefore given "limited weight."  (Tr. 36).

Plaintiff argues, in her second statement of error, that the ALJ's credibility finding was based on a misreading or mischaracterization of the evidence.  She points out that her hearing testimony was not, as the ALJ said, consistent with statements which would have been given by a rational person, and that the ALJ herself noted Plaintiff's unusual behavior while the vocational expert was testifying.  Plaintiff further contends that her activities of daily living after her onset date are fully supportive of her claim of disability and the ALJ did not evaluate those activities properly.

A social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking.  Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3).  Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record.  See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the Court concludes that the ALJ made a credibility

-15-

finding which was in the zone of reasonableness.  The ALJ
provided a number of sound reasons for finding Plaintiff less
than fully credible, and those reasons, noted above, find support
in the record.  As the Commissioner points out, it is not this
Court's job to reweigh the evidence, but only to determine if the
ALJ has evaluated it in a reasonable fashion.  It is important to
keep in mind that "[i]t is ... for the ALJ, and not the reviewing
court, to evaluate the credibility of witnesses, including that
of the claimant." Rogers v. Comm'r of Social Security, 486 F.3d
234, 247 (6th Cir. 2007). A claimant may "ask[ ] the Court to
reweigh the evidence, give her the benefit of the doubt to the
extent that these facts may weigh in her favor and then advance a
different view;" but that would not be proper because "the Court
is charged with determining the sufficiency of the evidence, not
its weight." Thomas v. Comm'r of Social Security, 2014 WL
2114567, *16 (N.D. Ohio May 20, 2014).  Under these deferential
standards, the Court finds no error in the way in which the ALJ
evaluated Plaintiff's credibility.

VII.  Recommended Decision

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be sustained to the extent that
this case be remanded to the Commissioner pursuant to 42 U.S.C.
§405(g), sentence four.

VIII.  Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a de novo determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,

in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u><br>
United States Magistrate Judge